UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT COVINGTON

CIVIL ACTION NO. 2:11cv16 (WOB-CJS)


LORRAINE McLAREN-KNIPFER                                    PLAINTIFF


VS.                    **MEMORANDUM OPINION & ORDER**


ARVINMERITOR, INC.                                         DEFENDANT



        Plaintiff brings this action under the Employee Retirement
Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a).
This matter is presently before the Court on the parties' cross-
motions for summary judgment, a motion to strike certain
evidence, the ERISA plan, and the Administrative Record.  *See*
Doc. 30 ("Amended Complaint"); Doc. 53-1 ("Plf. MSJ"); Doc. 66
("Meritor Sealed MSJ"); Doc. 63 (motion to strike); Docs. 40-1 –
40-6 ("Plan") (citation to internal pagination); Doc. 44
("Sealed Record") (citation to Bates-stamp pagination).

        Having previously heard oral argument on this motion, the
Court now issues the following Memorandum Opinion and Order.

## BACKGROUND

### A. *Parties*

Plaintiff initially named as defendants her former employer ArvinMeritor, Inc. ("Meritor"), and Meritor's insurer and claims fiduciary CIGNA Corporation.  The parties subsequently agreed to substitute the Life Insurance Company of North America ("LINA") for CIGNA, after which they reached a confidential settlement on the claim for long-term benefits.  The short-term disability benefits are self-insured by Meritor.  *See* Docs. 21, 73, 74; *see also* Meritor Sealed MSJ at 2, n.1.

Different LINA/CIGNA individuals were involved with Plaintiff's claim, and CIGNA is the corporate entity that appears on the appeal documents.  Meritor is "responsible for making the final decision with respect to all claims," Plan at 161, and is the ERISA fiduciary, *see id.* at 161, 164.  Meritor acquiesced in the final result without issuing a separate decision.  *See, e.g.,* Doc. 71-1 at 1 (letter dated 11/2/10 – "your second appeal . . . was denied . . . Your claim is closed").  The Court collectively refers to those involved with the claim as "reviewers."

### B. *Chronological Overview*

Meritor hired Plaintiff in 1988, when she was thirty-nine years old.  She performed customer service jobs for more than two decades and has been a Plan participant since 2004.  She

suffers from Chronic Obstructive Pulmonary Disease ("COPD"). Due to problems associated with that condition, Plaintiff's last day at work was February 10, 2010.  Plaintiff's appeal of her application for short-term benefits concluded on November 1, 2010, when the reviewers issued a letter that explained the reason for the denial.  *See, e.g.,* Amended Complaint at 3; Plf. MSJ at 2-3; Meritor Sealed MSJ at 3, 6; Doc. 53-4 ("Plf. Aff.").

　　After the denial and further correspondance with Plaintiff's treating physician, Dr. Robert Otte, Meritor issued a "termination" letter to Plaintiff on December 2, 2010, based on her "inability to perform the essential functions of her job."  Doc. 71-4 at 1.  The Social Security Administration subsequently granted Plaintiff disability benefits on December 17, 2010, with a start date for the award of February 11, 2010.  *See, e.g.,* Plf. Aff. ¶¶ 13-14, 16.[1]

　　**C.  Plan Terms**

　　The Plan provides short-term disability benefits for "disabled" employees for up to twenty-six weeks per episode, and offsets any payment with other benefits received, such as Social Security disability awards.  *See* Plan at 44-47.  If a disability

---

[1] Plaintiff began receiving retirement benefits in October 2011.  *See* Plf. Aff. ¶ 15.

recurs within three months, the Plan considers it to be "a resumption of the prior" disability.  *Id.* at 47.

The Plan defines "disabled" in two ways.  *See id.* at 45. As applicable here, the "occupation qualifier" test considers employees "disabled" if they are "[c]ontinuously unable to perform the material and substantial duties of [their] regular occupation."  *Id.* (internal emphasis omitted).  The duties are those "normally required for the performance" of the employee's regular occupation.  *Id.*

Plaintiff's customer service position was sedentary and performed exclusively in an office environment.  Both parties cite a written job description as the source of her duties:

- Providing timely customer ordering, order maintenance and process resolution services as well as order-board management.
- Receives and processes customer orders, in a fast[-]paced setting, according to specified policies and procedures.
- Interfaces with Inventory, Pricing, Marketing, Sales, Customer Credit, Specifications, and Operations groups, as well as external customers, to ensure prompt and efficient order processing.

* * * * *

- Ability to handle multiple tasks simultaneously.

* * * * *

- Displaying professional phone communication skills and a 'customer service' attitude.

Sealed Record at 627; *see also* Plf. MSJ at 2; Meritor Sealed MSJ at 3, 8.

-4-

Plaintiff's affidavit describes the work-related activities that would be physically too taxing, even with full-time use of an oxygen tank.  *See* Plf. Aff. ¶ 10.  It states that her COPD "rendered her incapable of carrying on the 'fast paced' work at her former employment or at any other employment," *id.* ¶ 9, and that her former job, "although sedentary in nature, was extremely stressful," *id.* ¶ 10.  She elaborates that:

> Her health condition has made it difficult for her to stay on the telephone for long periods of time, to do the required extensive filing because of fatigue, and the oxygen dependency from which she suffers increases in severity with any stress or engagement in any physical activity; she has a very difficult time going up and down any stairs, which is sometimes required for her to go on a company break or to attend company 'fire drills'.  Additionally, she has difficulty driving to and from work, walking around the building, and tolerating the air quality at work because of the COPD.
>
> . . . since she must carry a tank of oxygen with her at all times, she periodically has to go to her automobile, while on the job, to get additional oxygen tanks in order to make it through the day.
>
> . . . [Dr.] Otte . . . has indicated that any exercise or other stress will increase her oxygen dependency.

*Id.* ¶¶ 10-12.

The Plan provides that it will not pay short-term benefits if any of four conditions occur, one of which is if the employee "[f]ail[s] to provide proof of [his or her] Disability – including any medical documentation that may be requested." Plan at 47.

**D.  Proof Submitted For Claim**

Plaintiff was ill with bronchitis and sprained ribs for seventeen days in January 2010, and she received short-term benefits for her absence from work.  She returned to work for seventeen days and left work.  The reviewers considered Plaintiff's absence in February a "recurrent" claim, and the claims representative told Plaintiff the Plan would reopen her earlier claim and request additional medical records.  *See* Meritor Sealed MSJ at 6; *see also* Sealed Record at 427.

The reviewers initially denied the claim on April 13, 2010. Given the earlier claim, they knew that Plaintiff had minor heart failure in 2007 with chest pains that resulted in a hospitalization for one month.  In 2008 she was prescribed oxygen as needed for breathing difficulties.  She was out on short-term disability leave in August 2009 due to COPD with a comorbid sinus infection.  *See* Sealed Record at 420, 424, 425, 470, 643-44, 656.  Plaintiff underwent pulmonary testing on September 17, 2009 – the "Spirometry Report Puritan-Bennett Renaissance II."  *See id.* at 597, 664-65.  This test assessed Plaintiff with a "mild obstruction" that did not improve after medication.  It listed her having "lung age" of an "80" year old, which somebody highlighted by circling it.  *See id.* at 664-65.

For her February absence, Plaintiff reported to the reviewers that she "feels tired, hard to fucntion (sic), goes home and takes 3 hour naps . . . can't really breath (sic) well when she walks now . . . said its been happening [duration unspecified]." *Id.* at 420 (note created 3/1/10); *see also id.* at 424, 425, 643-44 (same note created 2/23/10, 2/17/10, and 3/10/10).

On March 10, 2010, Nurse Kimberly Baker concluded that Plaintiff should be awarded benefits because Plaintiff's claim was "medically supported through 3/14 as evidenced by dx of severe COPD, cs is on continuous o2, S[hortness] O[f] B[reath], chills, fatigue." *Id.* at 643.  The next day, Claim Manager, Joseph Glaise, revised the award through the end of the month. He concluded it was "reasonable" to extend benefits "through 3/31 due to cx having o2 treatment dependency" while the reviewers followed-up with "updated medical." *Id.* at 416; *see also id.* at 415.

Dr. Otte's "Medical Request Form," dated March 12, 2010, informed the reviewers that Plaintiff is "unable to work due to breathing difficulty." *Id.* at 639.  He indicated that Plaintiff should not work, rest at home, and could return to work without restrictions in mid-May. *Id.*

The reviewers initially assumed that Meritor would not accommodate "continuous oxygen usage" at work. *See id.* at 407,

-7-

625.  However, Meritor responded that it would "not have a
problem with her using oxygen at her desk."  *Id.* at 625.  Thus,
by the end of March, the reviewers were focused on ascertaining
Plaintiff's functional capacity.  *See id.* at 408, 624.

A lack of documentation by Dr. Otte defeated Plaintiff's
claim and the reviewers informed Plaintiff of the same by letter
dated April 13, 2010.  The letter provides that they denied the
claim because they could not "determine" she was "totally
disabled" from performing her "job duties."  *Id.* at 287; *see
also id.* at 602.  The letter detailed the lack of evidence and
the reviewers' unsuccessful efforts to contact Dr. Otte to
obtain additional information.

> On March 12, 2010, we requested from your provider any
> and all pulmonary functions tests, oxygen saturated
> tests or spirometry results, any laboratory results
> and any cardiac testing such as cardiac stress test,
> EKG, echocardiogram, with ejection fraction or cardiac
> classification.  We did not receive any new medical
> [information] from your provider other then (sic) the
> office visit note and the medical request form.
> * * * * *
>
> In addition, our Nurse Case Manager contacted your
> provider's office twice on April 5, 2010 and left
> voice messages, however to[-]date there was no
> response provided.  We also contacted your provider's
> office on April 12, 2010 for additional information,
> however no new medical information was provided.  We
> did receive a phone call from your provider's office
> on April 13, 2010 and we confirmed that we had all the
> current medical information in your file and there was
> no new medical information provided.
>
> There were (sic) no documentation of clinical findings
> that would indicate severity of symptoms, that would

preclude you from returning to work after March 31, 2010.

*Id.* at 286-87.  Though the reviewers had Plaintiff's September 2009 pulmonary function results, they "need[ed] current medical information to support your claim." *Id.* While they also had Dr. Otte's March "Medical Request Form" restricting Plaintiff to "no work" until Mid-May, the reviewers were of the view that his restriction was not "medically supported from the information [he] provided." *Id.*

After the initial denial, Plaintiff underwent two new pulmonary tests.  On April 20, 2010, Dr. Otte performed an "oxygen saturation test" with Plaintiff using "2L of oxygen." *Id.* at 622.  At rest, Plaintiff "had a saturation of 94% and pulse rate of 107," but when she walked, her saturation rate "dropped to 88% with a pulse of 127." *Id.* In this report he gave his "medical opinion" that Plaintiff "is unable to sustain any type of employment." *Id.*

Also on April 20, 2010, Plaintiff repeated the same pulmonary tests she underwent in September 2009. *See id.* at 597, 620-22.  The new tests did not persuade the reviewers because "FVC of 82 and 85 . . . are within normal limits and do not prevent claimant from functioning." *Id.* at 603; *see also id.* at 285 (letter dated May 19, 2010, stating new spirometry

results "does not change our prior decision" and advising about appeal rights).

### E. Additional Evidence In The Appeals

After the reviewers advised Plaintiff she could submit additional information for appeal, *see id.* at 281, 283, she called to tell them "there were no more tests," *id.* at 380, and to again explain her condition.  The note associated with that call memorializes the reviewer's own observation about Plaintiff's breathing difficulties:

> call from CX – she said that she went to the doctor on Thursday and he said there were no more tests.  Joseph[2] told her to call me or send letter explaining condition.  She has trouble just walking into work due to COPD and this is detrimental because it affects her heart.  She had to take 2 – 3 hour naps when she gets home at night.  Still then goes to bed at regular time.  She said that everything has been sent in.  Explained that I will document this and begin review.  She went back to work and went out again.  Walking from room to room she gets winded.  She can't go out if too hot or cold or muggy.  **She was noticeably SOB and said she had just gone from kitchen to bathroom.**  Has been dealing with it for about 2 years.  She kept getting bronchitis tmt plan – inhalers.  Seeing provider once a month.

*Id.* (emphasis added).

Although the reviewers did "not dispute [she] may have been somewhat limited or restricted due to your diagnosis," they

---

[2] Presumably claim manager Joseph Glaise.

concluded on August 17, 2010, that "based on the provided records, there is *no documentation of significant measured physical limitations and/or functional deficits* to continuously support the extension of restrictions from your regular occupation from April 1, 2010 forward." *Id.* at 276 (emphasis added). They interpreted the spirometry FVC result of 82% to be "within the normal range of eighty percent or higher," and the FEV1 result of 61% to "reveal[] a mild impairment." *Id.* Since these "test results provided only showed a mild impairment which is improved with the use of oxygen," and since Meritor "confirmed they were able to accommodate the use of oxygen," the reviewers again denied the claim. *Id.*

In a further appeal, Plaintiff's then-attorney Holly A. Daugherty resubmitted the 2010 spirometry test results, along with Dr. Otte's August 26, 2010 "Medical Assessment of Ability To Do Work-Related Activities" and a current list of Plaintiff's medications. *Id.* at 592. Among other things, Dr. Otte indicated Plaintiff: could sit/stand/walk less than 1 hour a day and cannot stand or walk without interruptions; becomes short of breath with any exertion or speaking; should not be exposed to environmental factors including temperature changes or dust; is oxygen dependent; and cannot work. *See id.* at 594-96. Plaintiff's handwritten note on a list of her medications states "Dr. Otte didn't write it but my oxygen wouldn't last the

full workday either[,] so I'd have to bring extra tanks to work." *Id.* at 598.

The November 1, 2010 final denial stated that the review was based on "the complete file, ***including any additional information*** . . . in its entirety without deference to prior reviews," *id.* at 270 (emphasis added), but reached the same conclusion. The "medical information does not support a disability of a severity that would preclude" Plaintiff from performing her "sedentary occupation" because Meritor would let her use an oxygen tank, her FVC result was normal, her FEV1 result only showed a "mild" impairment, and Dr. Otte's "limitations and restrictions" were not accompanied by "objective clinical testing to support those restrictions." *Id.; see also id.* at 369.

## ANALYSIS

### A. *Even Without Materials Meritor Seeks To Strike, Denial Was Arbitrary And Capricious*

In general, this Court should not consider anything that was not before the reviewers, for example, "any depositions, affidavits, or similar litigation-related materials." *Univ. Hosps. of Cleveland v. Emerson Elec. Co.,* 202 F.3d 839, 845 n. 2 (6th Cir. 2000). Meritor asks the Court to ignore and strike any documents that post-date the November 1st final decision,

including the Social Security award, Plaintiff's affidavit, and anything Dr. Otte or counsel communicated after that date.  *See, e.g.,* Doc. 72 at 2-3.[3]  Plaintiff does not make the sort of due process, procedural or bias challenges that are the exceptions to this general rule.  *See, e.g., Neubert v. Life Ins. Co. of N. Am.,* No. 5:10CV1972, 2012 WL 776992, at *11 (N.D. Ohio Mar. 8, 2012) (and Sixth Circuit decisions cited therein).  Thus, the Court should ignore any information generated after the final judgment and will grant the motion.  Regardless, Plaintiff is entitled to summary judgment.

The Plan grants Meritor "complete discretion and exclusive authority to . . . administer claims . . . interpret the terms

---

[3] Meritor moves to strike materials contained in Plaintiff's motion for summary judgment under Rule 12(f).  *See* Doc. 63 at 1.  A recent decision from the Northern District of Ohio involving LINA notes that the motion is procedurally improper because Rule 12(f) applies to "pleadings" and "[a]rguments contained in a dispositive motion are not 'pleadings' within the meaning of [Rule] 7(a) and are therefore not subject to a motion to strike under Rule 12(f)."  *Neubert,* 2012 WL 776992, at *11.  That court also recognized, however, that ERISA review generally is confined to the evidence and facts before the plan administrator at the time it made its decision.  *Id.*

Disability awards by the Social Security Administration are not binding but are relevant to the issue of arbitrariness.  However, the parties have not cited, and the Court has not found, any authority that exempts these awards from the general requirement that the information must have been before the reviewers when they made their decision.  *See, e.g., Costello v. Sun Life Assurance Co. of Canada,* No. 1:08-CV-00157-M, 2012 WL 1155142, at **2, 4-5 (W.D. Ky. Apr. 5, 2012) (administrator obtained copy of Social Security Administration's file); *Neubert,* 2012 WL 776992, at *19 (administrator assisted applicant with applying for Social Security benefits); *Deel v. United of Omaha Life Ins. Co.,* Civil Action No. 11-12751, 2012 WL 928349, at *12 (E.D. Mich. Feb. 27, 2012) (post-decision Social Security award is immaterial, even if the employer had a duty to inquire about pending application); *Kaye v. Unum Group/ Provident Life and Accident,* No. 09-14873, 2012 WL 124845, at *6 (E.D. Mich. Jan. 17, 2012) (administrator reviewed Social Security file).

-13-

of the . . . Plan . . . including the sufficiency and amount of information that may be required to make its determinations, including those pertaining to claims and appeals." Plan at 161. As such, and as the parties agree, this Court cannot overturn the decision to deny Plaintiff benefits unless it was arbitrary and capricious.

"An administrator's decision is not arbitrary or capricious if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Lewis v. Cent. States, Se. & Sw. Areas Pension Fund,* No. 10-4259, 2012 WL 1736409, at *3 (6th Cir. May 17, 2012) (internal quotations and citations omitted). This is a highly deferential standard of review, though "not . . . without some teeth," and simply because the Court's review is deferential "does not mean [it] must also be inconsequential," since "federal courts do not sit in review . . . only for the purpose of rubber stamping" them. *Costello,* 2012 WL 1155142, at *3 (internal quotations and citations to Sixth Circuit authorities omitted). This Court's review "inherently includes some review of the quality and quantity of the medical evidence and the opinions on both sides of the issues," as well as "whether the plan administrator based its decision to deny benefits on a file review instead of conducting a physical examination of the applicant." *Id.* at *4 (same).

-14-

Here, the terms of the Plan grant benefits when an employee is unable to perform his or her job.  Thus, a diagnosis is not determinative, and Plaintiff's functional capacity is key. The main requirements of plaintiff's job according to Meritor's own description are working at a fast pace while multi-tasking, and displaying a professional demeanor while talking on the phone.

There is no dispute that, when Plaintiff applied for short-term benefits, her health had deteriorated to the point where she needed to use an oxygen tank on a full-time basis.  No reviewer questioned Plaintiff's need for full-time oxygen, or that exertion causes shortness of breath (as one reviewer in fact perceived first-hand and documented), yet none of them discussed what that meant in terms of the particular requirements of Plaintiff's own job.  In short, the reviewers' analysis is devoid of the very comparison of functional abilities to job requirements that the Plan requires.

Though they did not directly say so, the reviewers also wholly ignored Plaintiff's subjective assessment of her abilities and what they personally observed about her shortness of breath, instead using the latest pulmonary test results as a proxy for functionality.  Yet, nothing in those test results inherently reflects on the stamina or skills required of Plaintiff for her particular job.

Even if the results conceivably could be construed in that manner, it is clear from the face of the results that the reviewers were selective about which results they considered. Nor did they explain what they used as the source for deeming a value "normal" or "mild."  Also, the reviewers plainly mischaracterized some of the results.

For example, while the 2009 and 2010 tests both showed abnormal results marked "*", Plaintiff's 2010 test results were clearly worse.  A comparison of the initial graphs show the same predicted value arc spiking to above 5, and whereas Plaintiff's 2009 results showed her results in the 3 to 4 range, her 2010 results showed the same at 2.5 and below.  *See Sealed Record* at 620, 664.  Although the 2010 results did not list a "lung age," that report now assessed Plaintiff with "moderate obstruction." *Id.* at 620.  And, the FVC (and later, FEV1) measurements the reviewers found significant were clearly lower in 2010 as compared to 2009.

```
        2009 Trial 1                Trial 2
            FVC         91          FVC         94
            FEV1        70*         FEV1        70*
            FEV1%       77*         FEV1%       74*
                (no "Best FEV1% results)
```
*Id.* at 664.

```
        2010 Trial 1                Trial 2
            FVC         82          FVC         85
            FEV1        61*         FEV1        60*
            FEV1%       73*         FEV1%       71*
            Best FEV1% 60%*         Best FEV1% 58%*
```

*Id.* at 620.

The reviewers initially cited the FCV above 80% as "normal" to justify denying benefits, without consideration of the other asterisked values.  When they later cited the abnormal 2010 FEV1 value, they labeled the result as a "mild" designation but the overall 2010 test results designated Plaintiff as having a "moderate" condition.  Nowhere do those 2010 results mention a "mild" condition.[4]

At the hearing, defense counsel mentioned in passing that the oxygen saturation tests Dr. Otte performed were "normal" because the percentage was in the mid-nineties.  As noted above, however, it was only at rest that Plaintiff had 94% saturation

---

[4]  Their mischaracterization is further confirmed by reference to recognized Internet sources.  Information about the percentages the reviewers cited is readily available on the Internet, beginning with the National Institutes of Health ("NIH").  Courts routinely take judicial notice of medical websites such as the NIH for definitional purposes, with or without notice to the parties.  *See, e.g., Hicks v. Corr. Corp. of Amer.,* No. CIV.A.CV08-0687-A, 2009 WL 2969768, at **6, 9, 21 & nn. 4-5, 10-11  (W.D. La. Sept. 11, 2009); *Phelps v. Astrue,* No. 7:09CV0210, 2010 WL 3632730, at *5, n.2 (W.D. Va. Sept. 9, 2010); *In re Nixon,* 453 B.R. 311, 316 n.2 (Bankr. S.D. Ohio 2011).

Spirometry results include different measurements and compare them to "predicted" values.  The NIH website provides that "[n]ormal results are expressed as a percentage.  A value is usually considered abnormal if it is less than 80% of your predicted value." http://www.nlm.nih.gov/medlineplus/ency/article/003853.htm

The 80% cut-off between normal and abnormal results is found in the "GOLD Spirometric Criteria for COPD Severity."  The "Gold" criteria contrast "mild" COPD, something a patient probably is unaware of, with "moderate" COPD, where the patient is developing shortness of breath on exertion. http://copd.about.com/od/copdbasics/a/stagesofcopd.htm.

rate with a pulse rate of 107.  When she exerted herself by
walking, her saturation rate dropped to 88% and her pulse rate
rose to 127.  Since that test was performed while Plaintiff was
using oxygen, it shows that exertion has consequences for
Plaintiff, and that fact is no doubt why the reviewers' focus
was on the results of the spirometry results, and not Dr. Otte's
oxygen saturation test.

In addition, although the Supreme Court has held the
"treating physician rule" from the Social Security context does
not apply in the ERISA context, it "did not prohibit a reviewing
court from applying the applicable standard of review to the way
in which the plan administrator dealt with an opinion from a
treating physician, noting that '[p]lan administrators, of
course, may not arbitrarily refuse to credit a claimant's
reliable evidence, including the opinions of a treating
physician.'"  *Combs v. Reliance Standard Life Ins. Co.,* No.
2:08-cv-102, 2012 WL 1309252, at *10 (S.D. Ohio Apr. 12, 2012)
(quoting *Black & Decker Disability Plan v. Nord,* 538 U.S. 822,
834 (2003)).  The Sixth Circuit holds likewise.  *See id.* (cites
and parenthetical quotes to *Evans v. UnumProvident Corp.,* 434
F.3d 866, 877 (6th Cir. 2006), and *Curry v. Eaton Corp.,* 400 F.
App'x 51, 59 (6th Cir. 2010)).

Citing illustrations from *Evans,* the *Combs* decision
discussed several situations where a reviewer's disregard for

the opinion of a treating physician can be considered arbitrary.

They are all similar to the situation here, such as:

- the reviewer "disregard[s] subjective reports of symptoms based solely on a review of medical records which do not contain objective support for the claimant's complaints," *id.* (citing *Calvert v. Firstar Fin., Inc.,* 409 F.3d 286, 296 (6th Cir. 2005));

- the reviewer relies on an "expert opinion that does not address crucial aspects of the claimant's former job and which is in conflict with other credible evidence in the record, including the opinion of the treating source," *id.* (citing *Kalish v. Liberty Mut./Liberty Life Assurance Co. of Boston,* 419 F.3d 501, 506 (6th Cir. 2005));

- "evidence from the treating physicians is strong and the opposing evidence is equivocal, at best, and also lacking in evidentiary support," *id.* (citing *McDonald v. Western-Southern Life Ins. Co.,* 347 F.3d 161, 172 (6th Cir. 2003)); or

- a "contrary opinion of the non-treating physician was not based on an examination of the claimant and was supported only by a selective, rather than a fair, reading of the medical records," *id.* (citing *Moon v. Unum Provident Corp.,* 405 F.3d 373, 379 (6th Cir. 2005)).

In each of these examples, the reviewers reached their decision on a selective view of certain medical evidence.

Here, the reviewers' failure to apply the Plan criteria which require an assessment of functionality, and their treatment of the tests results and Dr. Otte's opinions that eventually specified Plaintiff's functional abilities, alone warrant summary judgment in Plaintiff's favor. Such "cherry-picking" and lack of textual support are grounds to find the

decision arbitrary and capricious. *See, e.g., Lanier v. Metro. Life Ins. Co.,* 692 F. Supp. 2d 775, 786 (E.D. Mich. 2010) (and cases cited therein).

Other factors in this record underscore that conclusion. For example, although the Plan clearly contemplates Meritor can order an independent examination, it chose not to do so. Thus, the only physician evidence in the record was that from Dr. Otte and the tests conducted while Plaintiff was under his care. Aware of those results and Plaintiff's condition, he was of the opinion that Plaintiff could not work. Dr. Otte's opinions about Plaintiff's functional capacity were the sole evidence on the subject besides Plaintiff's description of her abilities. Yet, the reviewers rejected his opinion out of hand based solely on their narrow and inaccurate interpretation of the test results, as opposed to a genuine disagreement among medical professionals. *Compare, e.g., Costello,* 2012 WL 1155142, at *8.

The "Sixth Circuit has repeatedly noted that there is 'nothing inherently objectionable about a file review by a qualified physician in the context of a benefits determination.'" *Id.* at *6 (quoting *Calvert,* 409 F.3d at 296). "However, 'the failure to conduct a physical examination -- especially where the right to do so is specifically reserved in the plan -- may, in some cases, raise questions about the

thoroughness and accuracy of the benefits determination." *Id.* (quoting *Calvert,* 409 F.3d at 295).  This is one of those cases.

Finally, another factor at play here is conflict of interest.  As the "final decisionmaker" and self-insurer, Meritor assumes that a "structural conflict of interest" existed, but denies that it had any actual impact on the decision.  *See* Meritor Sealed MSJ at 35-37.  With such conflicts, the Court is entitled to view the reasons for denying Plaintiff's claim with "some skepticism," and weigh this as a factor in deciding whether the decision was arbitrary or capricious.  *See, e.g., Lewis,* 2012 WL 1736409, at *3, n. 5 (citing *Metro. Life Ins. Co. v. Glenn,* 554 U.S. 105, 111–12 (2008)); *Costello,* 2012 WL 1155142, at *4 (citing *Moon,* 405 F.3d at 381-82).  As with the post-final-decision materials, however, even if the Court ignores the conflict factor, the result is the same for all the reasons just discussed.

Accordingly, Plaintiff is entitled to summary judgment on the short-term benefits claim in Count One of her Amended Complaint.

### B.  Breach Of Fiduciary Claim

In Count Two, Plaintiff alleges a breach of fiduciary duty under 29 U.S.C. § 1104, and demands as compensation the denied benefits, damages for emotional distress, and "appropriate equitable relief."  *See* Amended Complaint at 6-7.  However, the

-21-

basis for Count Two is the same as her denial of benefits claim.
For example, she alleges a conflict of interest and arbitrary
and capricious denial of benefits, in addition to a failure to
properly investigate her claim for benefits by conducting an
independent medical or vocational evaluation.  *See id.* at 7.

Relief is not available for a claimant's individual
purposes under § 1104.  Any relief under that section is plan-
wide and based on breaches of fiscal-type fiduciary duties
connected with administering a plan, none of which are asserted
or arguably applicable here.  *See, e.g., Unaka Co., Inc. v.
Newman,* No. 2:99-CV-267, 2005 WL 1118065, at *14 (E.D. Tenn.
Apr. 2, 2005) (and cases cited therein).

The Court notes that Plaintiff cited sections 1132(a)(1)(B)
and 1132(a)(3) at the outset of her allegations, but these also
are not viable alternatives for Claim Two.  *See* Amended
Complaint at 1, 5-6.  Section 1132(a)(1)(B) is the avenue to
challenge a denial of disability benefits, and the Court has
already ruled in her favor on that aspect of the case.
Subsection (a)(3) does not provide an additional basis for
relief when a denial of benefits is at issue, regardless of
whether the argument is cast in "breach of fiduciary duty"
terms.  *See Wilkins v. Baptist Healthcare System, Inc.,* 150 F.3d
609, 615 (6th Cir. 1998) ("Because § 1132(a)(1)(B) provides a
remedy for Wilkins's alleged injury that allows him to bring a

lawsuit to challenge the Plan Administrator's denial of benefits to which he believes he is entitled, he does not have a right to a cause of action for breach of fiduciary duty pursuant to § 1132(a)(3)"); *see also e.g. White v. Worthington Indus., Inc. Long Term Disability Income Plan,* 266 F.R.D. 178, 194-96 (S.D. Oh. 2010) ("1132(a)(3) . . . has been described as a catch-all section designed to allow plan beneficiaries to seek relief for violations . . . which would not be addressed simply by an award of benefits under § 1132(a)(1)(B)") (internal quotations and citations omitted); *Blair v. Pension Comm. of Johnson & Johnson,* ___ F. Supp. 2d ___, ___, Civil Action No. 11-433-C, 2011 WL 6393571, at **2-3 (W.D. Ky. Dec. 21, 2011) ("Section . . .(a)(3) acts as a safety net, offering appropriate equitable relief for injuries caused by violations that § 502 does not elsewhere adequately remedy.") (internal quotations and citations omitted).

Accordingly, Defendant is entitled to summary judgment and the Court will dismiss Count Two of Plaintiff's Amended Complaint.

## CONCLUSION

In sum, the Court finds that, even if the motion to strike is granted, that result has no bearing on the outcome. The Court grants summary judgment in favor of Plaintiff because the decision to deny short-term benefits was arbitrary and

capricious, and the Court dismisses Plaintiff's breach of fiduciary duty claim.

Therefore, having reviewed this matter, and the Court being otherwise sufficiently advised,

**IT IS ORDERED** that:

(1) Defendants' motion to strike (Doc. 63) is **GRANTED** and the parties' cross-motions for summary judgment are **GRANTED IN PART AND DENIED IN PART** (Docs. 53, 65), consistent with this Memorandum Opinion; and

(2) **Within thirty (30) days of entry of this Memorandum Opinion and Order**, the parties shall file a status report advising the Court whether they have reached an agreement as to the amount of disability benefits to which plaintiff is entitled.

This 27th day of June, 2012.



Signed By:

*William O. Bertelsman* WOB

United States District Judge